All right, Mr. Snyder, we're ready when you are. Good morning, Your Honors, and may it please the Court. This case is about the meaning of the word own in a commercial crime insurance policy. After Cooper's employee benefit plans were defrauded out of tens of millions of dollars It's like somebody would have devoted a slight amount of attention in all this paper to define a term like own, at any rate, what do I know? Well the word own is actually very clear under Texas law, and the Texas Court of Appeals has defined a common definition of the word. Well the word own is one thing, the word loan is another thing, and I didn't know that you own what you loan. So when a loan is obtained by fraud under I didn't know I was a rapper, did you? No, I didn't. I'm writing it down in my notes. Under Texas law, when a loan is obtained by fraud, ownership splits between the person who made the loan and the person who received the loan, and the person who made the loan retains equitable ownership of the property. Well you got a whole lot back out of this loan, right? First of all, what exactly is Cooper Industries trying to claim? Because this is a very complicated transaction. I get my eyes glazed over when I was trying to figure out the difference between the equity loan, the bond fund, the promissory note to WGTI, whatever you recouped from the legitimate investments versus illegitimate. So exactly what is your theory of own and loss based on? So, Cooper, at the moment that it lent the funds to WG Investments I don't know. Answer my question. Is it based on the promissory note to WGTI by the bond fund? So, in part, yes. It would be both that loan and it would also be the loan that was made on the equity fund. So it's based on two promissory note aspects of this transaction? Yes, those are the transactions that established the initial loss. And at that point, when the principal was transferred from Cooper and Cooper's employee benefit plans to WG Investors, there would have been a loss of principal. And there are multiple other courts that have addressed that question. Now that was when, in 2004 or 5, right? When WCM, you first entered into a contract with WCM to engage in these transactions, right? Yes, Your Honor. And it is your contention that these promissory notes were fraudulent from the inception? Yes, they were fraudulently obtained because Westridge and WG Trading, the joint venture, was using fraudulent promotional materials that overstated the earnings that they were actually earning on WG Trading's investments. And there's evidence in the record that Cooper relied on those fraudulent materials in making the loan. And so the loan would have been fraudulently obtained. And so at that point, there would have been a loss of the principal. And under Texas law, because Cooper retained equitable ownership of— Let me ask you, why did you make a claim to the receiver in regard to these promissory notes as a creditor of WGTI and WGTC? So Cooper was a creditor. It was also an equitable owner. It was both. Well, if you were an equitable owner, you could have told the receiver, we have a right to get the money back. Well, Cooper had a right to get the money back under— But your right stands on no higher ground than that right of anybody else who also got defrauded in the transactions, right? That's true, although at the time that Cooper submitted the claim to the receiver, the insurance claim hadn't been denied at that point. And so the issue of ownership hadn't come up. And so Cooper submitted the claim to the receiver as a creditor, but that doesn't mean that it wasn't also an equitable owner. I really have a hard time with this because, you know, banks issue fraudulent loans all the time to people who turn out to be fraudsters. And let's say it's a fraudulent auto loan because the person doesn't qualify for the loan or whatever and knowingly misrepresents his income, and does the bank then—and leaving aside the question of collateral, but does the bank then own part of the car that was bought with the loan? So the— I mean, where do you have a single case? You talk about the breadth of the term ownership by reference to Texas tax law, by equitable remedies for fraud, by sales—I mean, you know, all the water law, all this strange stuff. And I didn't see a single case that treats a defrauded lending entity as the equitable owner of the funds to say nothing of the underlying property. So Your Honor, I'm not aware of a case that addresses these precise facts. Maybe that's because there isn't such a case. Well, in interpreting the word own, the Texas courts look at a very broad spectrum of cases. They look at how the word has been interpreted in other contexts. Well, what we're looking at is a clause that does not provide a guarantee against bad decisions. It's a guarantee against stealing your property. Yes, that's true. Where do you have any case under one of these crime-based insurance policies that allows a party that has provided a loan to recover money under them? So there are three cases that we cite from the Seventh, Ninth, and Tenth Circuits. The United Pacific case, the universal mortgage case are two of those examples, and the Portland federal case would be the third example, which is in the second section of our brief. And all of those courts address the question of whether there is a loss of property that is owned at the moment that a fraudulent loan is obtained. And each of those courts have said that at the time that the fraudulent funds are dispersed, that there's a loss under a commercial crime insurance policy like this one. So at the very least, Cooper lost the principal when it made the loan, and Cooper also retained equitable ownership of the property because the... Didn't Cooper manage to try to paper over the way in which it recovered from the receiver in order to say, you're paying us on the interest, not on the principal? If I'm understanding Your Honor's question... Because you're saying at the minimum you lost the principal on these loans, not the interest. And I understand what the judge said about that. A loss is a loss. But if the... I still don't see how you have any more right to claim the interest vis-a-vis other creditors of a Ponzi scheme. But anyway, they allege at some point that you document... Maybe it's only a side issue. Documented your loss claim to the receiver and said, no, tell us that you're paying us this $8 million or whatever it is on the basis of the interest, not the principal. So if Your Honor is referring to the letter that Cooper sent to the receiver... So yes. The letter that is in the record doesn't say anything like what National Union alleges. So what was actually going on there is the receiver had tried to claw back $21 million in earnings that Cooper had received from WG Trading. Cooper responded with a letter that was simply saying the receiver only has the authority to take possession of property that is in the possession of the fraudsters. This money has already been given back to Cooper. And so that particular money is not in the possession of the fraudsters. Cooper was not saying that it didn't have an ownership interest in any of the property that was still in the fraudsters' possession. And in fact, that's why I filed the insurance claim later to say that it actually did have ownership in those funds. And I think the word own under Texas law is very clear that it includes both legal and equitable ownership. And we've cited cases that deal with other insurance policies. And those courts that have addressed those issues have actually looked at the meaning of the word own in much the same way that Cooper has here, by looking at how the word is used in other contexts. So for example, the Faust case involves an auto insurance policy, and the court there looked at the meaning of the word own by looking at a statute that involved street improvements. So we can look to other sources of law to determine what the meaning of the word own is. A clause, a policy like this, where the insured interest is against, quote, a criminal act, is there a case you're citing where the court is construing this kind of clause, though, and looking at the word own? I understand what you just said about other cases talking about own in a variety of other contexts. But coming back to maybe one of the earlier questions Judge Jones asked you, or indirectly, this is a specifically bought and paid for policy for a specific kind of loss. It has its set of exclusions, as all insurance policies do. So what case or is the closest case you have where a court is construing this kind of loss clause and having to define own? So there aren't any cases that we're aware of that construe this type of ownership provision one way or the other. But this sort of policy is not atypical in the insurance industry, correct? No, it's not. But this particular issue about equitable ownership versus legal ownership appears not  Well, let me, in the FDIC versus United Pacific case, the court says in terms of loss with respect to the making of loans, a bank suffers a loss when funds are dispersed due to the employee's wrongful conduct. The measure is the outstanding balance due on the loan. It doesn't, it has nothing to do with ownership. It's loss resulting from funds being dispersed due to the employee's wrongful conduct. You're correct, Your Honor. And that case does not deal with the meaning of the word own. That is our alternative position. But you said that well, and that may be something else. But you did cite that in regard to the question of own. No, Your Honor. I was citing that as talking about cases, talking about whether there is a loss with this kind of fraudulently obtained loan. So even if you think that the word own requires legal ownership, those cases, Portland Federal and United Pacific, establish that at the very least, Cooper suffered a loss at the moment that it lent the principal. So is it that you want this case and us to opine that this word own means this in the context of this clause? Our primary position is that Cooper was an equitable owner, and that's the outcome that we would like this court to take. And at the, because this is an insurance policy, ultimately Cooper's interpretation only has to be a reasonable one. What's the difference between relying on the equitable owner position and relying on the loss position? So if Cooper's only loss was the principal, and we're talking about legal ownership, then Cooper would be able to recover the principal, but not any of the earnings that were generated on it. If this court interprets the word own to include equitable ownership, then Cooper would be able to recover both the principal and any of the earnings that were generated with the principal. So there's one other point that I want to make about this particular policy and why allowing equitable ownership makes particular sense in this policy. So the point of commercial crime insurance is to protect against fraudulent or dishonest acts of an employee. But if the policy doesn't cover equitable ownership, then it wouldn't cover some of the most basic types of employee misconduct. For example, investors are generally only the equitable owners of book entry securities, and the policy covers the theft of securities. So if you held that the word own didn't cover equitable ownership, then that wouldn't count as a loss if an employee went and stole the book entry securities from the insured. Likewise, a beneficiary of— I don't understand that at all. So an investor that has a book entry security is generally only the equitable owner. And so under national union's interpretation, if the insured's employee stole the book insured for purposes of the policy. That just seems strange. If you're buying a policy to insure against the misconduct of your employee theft, to me, you wouldn't be buying a policy that has an abstraction in it as to what the ownership. I mean, you're saying I own this in all senses of it. It's mine, and that's the reason why I'm insuring against an employee stealing it. So when I make a claim, it's not going to be I've got to go through all these striations. Do I equitably own it? Do I legally own it? Whatever. It's mine. Employee stole it. And so that just seems to be the animus. So to hear to say you buy a policy to insure against a specific kind of loss, that is criminal clerk—I see the light is red, but you're still going to end up having to answer my question at the end when it turns red. And so I'm saying, putting aside all that abstract, but just coming back to the basic principles of insurability and buying a policy. So if you're insuring against employee theft, loss, etc., it's mine, equitably legal. The ownership is joined. So it's like a strained interpretation you're offering to say that that's not something specifically bargained for in buying the policy. So how is it we should construe this policy in the terms of equitable ownership when that's not provided for explicitly in the bargain for and agreed policy? You understand my question? Yes, Your Honor. So there are two responses to that. First, under Texas law, when courts are construing an insurance policy, the policy has to be strictly construed in favor of the insured. So ultimately, Cooper's interpretation of the word own only has to be reasonable. And every single time that the question about what the word own means has come up under Texas law, the courts have held that it includes both legal and equitable ownership. So at the very least, we think we have established that the word own is a reasonable interpretation. Well, now, your example—and I'm sorry, may I? No, go ahead. Yeah, yeah. There are a lot—there are other issues in this case. So maybe I hope you're not—I hope the chief will say you're not waiving my questions about some of the other issues. But your example about the book entries is contradicted in this very policy because there's an exclusion for losses for which Cooper is legally liable, right? An exclusion for which they're legally liable? In other words, Cooper wouldn't be covered by this policy for the action of the employee who takes an—takes some of the property that belongs to a third party. Cooper would not be— He's nodding his head. You just—you didn't argue it, but it's very plain. So your hypothetical is no good. Well, Your Honor, I think you could also look at the example of a formal trust. So if a trust beneficiary generally only has— But this is not a policy sold to a trust beneficiary. And maybe that kind of policy has different language. This kind of policy could cover that kind of a situation. And the word own in that context would need to cover equitable ownership. Otherwise, the trustee could steal the trust beneficiary's property. Well, suffice it to say— It doesn't insure against your own illegal conduct. That's what I'm saying. And Your Honor, Cooper hasn't engaged in any illegal— No, never mind. All right. Suffice it to say, for purposes of where we are, you know, Judge Jones's good question triggered us into putting aside the policy language straight up that I was asking, but she led you into where we needed to be as well. Is there defending based on exclusions also? And so her question gets us on the books in terms of the exclusions. So just beware that when you come back up on rebuttal, something tells me that the appellee is going to argue both the insurability as well as the exclusion. So probably when you come back, we've at least gone into that area, and you may have to respond and explain to us how it's not excluded by the exclusion. Even if you were right about the equitable and legal, we know the insurance companies depend on exclusions as well, and it seems that they at least have a plausible argument about the exclusions. You follow me? So— Yes, Your Honor. At least you haven't waived any of that, but when you come back up, it's like that's something you should help us understand a little bit better why you're not excluded, putting aside the other arguments. You got me? Yes, Your Honor. All right. Appreciate your open argument. Thank you. All right. Mr. Davison, not presaging anything that you might not plan to say, but this is a little bit of a strange animal here, at least for me. Go ahead. Excuse me. Thank you, Your Honor. Just to record my appearance, Michael Davison on behalf of the National Union. And I want to go right to a couple of things that Judge Jones and Judge Stewart raised on this in the—a moment ago. The first question you asked was what is the—well, one of the first questions you asked is what is the closest case to this? And there was an admission that they don't know of any case, but that's actually not accurate. The closest case to this is a Fifth Circuit case called Lynch v. Potomac Insurance Company of Illinois from 1998. And that case dealt with the same clause, this interest-covered clause. And the whole point of that case was they weren't interpreting own, they were interpreting the word hold. But the idea in that case was that this clause was restrictive. It was designed to not expand coverage to cover all types of interest in property. It was designed to restrict that coverage. What clause per se? Are you talking about own or are you talking about loss or what? The same clause, own, hold, or lease. This is an interest-covered clause in a commercial crime policy that is standard in the industry. It has slightly different language between policies, but the basic concept is in a—so a commercial crime policy is simply a fidelity bond. So it guarantees the faithfulness of employees. So basically, the whole idea here is that if you take my property, if you—the paradigm of coverage being embezzlement, you embezzle my funds, if you're a bank or anybody, and it's your property, you own it, you're holding it as a bailee, then there's coverage. That's what this is for. As Your Honor said, this is not to cover the dishonest acts of the insured. It's not to deal with a fraud committed against a third party by the employee. It's the fraud of the employee committed against the insured. Then how do you explain the United Pacific Tenth Circuit case? The United Pacific Tenth Circuit case, as you correctly said, does not deal with ownership. But I will concede that there is a split in the case law about when a loss occurs, when a financial institution makes a loan. Some cases say the loss occurs at the time of the loan. Some cases say it occurs when there's a default on the loan. You don't have to get there. The district court never even reached that issue. It doesn't even—it doesn't matter on ownership one way or the other, as you correctly pointed out, Your Honor. But what it—but there is that split. So, you know, I would suggest to you that in this case, and under these facts, that there was no loss at all until there was a default, especially when you're seeking a claim like here for lost profits. They're not seeking the principal back, really, because there's only—they're only short on the principal about a million dollars.  I'm sorry, Your Honor. Is that established, sorry, to a summary judgment certainty? I think so, Your Honor. Let me—let me try—these facts are complicated. Well, don't—don't bug me with the fact—I mean, we can look at that. If you say so, we'll look at it in the record. But— Well, the point—the point is that they're primarily making a claim for lost profits. They have a $17 million claim for lost profits. They have to have over 10 in any case. They have to—they have over 10, because that's the policy limit. That's correct. So—so the other issue that Your Honor raised is insurability and abstraction. And I think that's a really, really important point. The fact is, in this circuit and in many, many other circuits, you know, you—a fidelity policy, there's been—there's case law—again, it's the Lynch case again. The Lynch case says you cannot take the coverage of a fidelity policy and extend it by implication or enlarge it by construction. And that's exactly what they're trying to do here. There's not a single case out there that says fidelity policies were ever meant to include equitable interests, because that's an abstraction. As you said, that's a construct. Well, if this is not an equitable interest, we don't have to deal with it, right? Correct. If it's not an equitable interest, the case is over. The Eighth Circuit has ruled that a limited partner has no interest in— I don't understand why the case is over, because it seems to me that the—that this is the—the statement that this covers loss due to—and I've got to find the exact language—does not use the language of ownership. That statement in the policy does not use the language of ownership. I have to confess I'm not quite tracking, Your Honor. Well, go ahead. I don't want to— So— —get back to it. I do believe if—to own the requirement of ownership is an element of coverage. It is their burden to prove all the elements of coverage. If they cannot prove that condition, there is no coverage. And you don't have to go any further, and you don't have to consider any of the issues raised on the cross-appeal. I would just, for the sake of the discussion, it's your policy, not you personally, but I mean, it's the insurance company's policy. So, you know, all these age-old axioms of, you know, construing the policy against the—or in favor of the insured, blah-di-blah-di-blah-di, just seem odd that, I guess, a term like policy—but, of course, we get a lot of cases where things aren't clearly spelled out, notwithstanding. But given the sort of narrow context of this being a fidelity policy to insure against X, I mean, it's just not a regular policy. It's a little odd that own—we've got to look at all these Texas cases or whatever in other contexts to figure out what own means. Well, that's a fair point, Your Honor. You can't define every term in a contract. Yeah, but I mean, that's kind of—that's not like a way-out term. It's not a way-out term, but I think the reason it's not defined, this is my belief— That everybody would know what it means. Everybody knows what it means. I mean, the reality is it's the legal—it's a legal right to possess a thing. They cite three insurance cases in their brief. Those three insurance cases support our view of life, okay? And all those three insurance cases, none of which are fidelity bonds—I think two are property policies, one's an auto policy. In those three insurance cases, the insured either had some form of title to the vehicle or to the property or—and, not or—and possessed the property at the same time. And in the first case they cite, which is an 1895 case, Liverpool, that ancient case says that a lien holder has no ownership interest in the property that it loaned money for the person to purchase. And that's the point. Just because you're a lender and you loan money and someone goes out and buys a thing, you don't own the thing. You have this secured interest, maybe, if you've properly protected yourself, but you don't own the thing. So to answer your question, Judge Stewart, that, you know, it really, I think, is a—in an insurance policy of any kind, you're supposed to look at the common meaning of the term, not some esoteric meaning, not some—you're not supposed to import principles into the policy. You're not supposed to look at the tax code. You're not supposed to look at, you know, airport ordinances to determine what's covered and what's not. You're supposed to determine the plain meaning. That's why people buy these policies, the plain meaning. Can you imagine what the application would look like for this insurance if it covered all the beneficial interests that someone, you know, might construe out in the world? You can't—nobody would write this policy. You ask an insurer in an application for this policy, what are your assets? What do you own? If you're a bank, you know, how much deposits do you have? Well, then, sorry, but I go back to the United policy because it must be an unstated assumption in this, sorry, FDICB United Pacific Insurance, which was tried to a jury, it must be an unstated assumption in there that somehow the bank had a right to make a claim on the bond in question. Well, it's— Because the legal issue is there is whether the bank suffered a loss. Yeah, but in those cases, that's a loss of principle, Your Honor. So I make a loan, okay? I lose the principle. So why are you arguing that they couldn't recover the loss principle here? I'm—well, because— Because I would create a split with the Tenth Circuit, would it not, or not? Well, we're arguing that they can't recover the loss principle for lots of other reasons, including ownership. But you don't—the facts of this case are different than a bank loan, okay? They didn't make a loan. They were an investor. They put money—they purchased two promissory notes. That's what they owned, was the two promissory notes. And that money went into a partnership fund that was used to buy and sell securities. And it doesn't matter what you make the loan for if it's—well, you're saying you're purchasing an interest in a promissory note. Is that what you're saying? I'm also saying that the United Pacific case is not the only case on the subject. And other opinions—most of the opinions say there's a loss at the time. Give me an example of one cited in your brief. I'm sorry. I don't remember. It's okay. I cannot give you—I did not write that down in my notes, and I can't give it to you, but it's in the brief. I know there are opinions in—that say that the loss does not occur until there's a default. I mean, you know, because you don't know if you're going to suffer— But again, I mean, that concedes. If you're saying the loss doesn't occur until a default, you are conceding there is some insurable interest or, quote, ownership covered by the policy. I don't think you're conceding that there's some insurable interest or loss in this case versus a traditional loan case. And I do think they're different, Your Honor. This is a case where they're making an investment. Well, you didn't make a real good—I mean, both briefs were unsatisfactory in various ways, but this—I know you were alluding to this argument, but to me it was not systematically made. So if you would like to—I don't want to waste your time because you have a couple other interesting exclusions, but I was confused. You're definitely not wasting my time, Your Honor. So again, the first issue is this whole issue of when the loss occurred is not the same thing as ownership. That—you're conflating two subjects there. The second is that wasn't even ruled on by the district court. The third thing I would say is that there are cases that suggest that, you know, loss of something—in other words, I make a loan, I foreclose on the collateral, I take the property back, I have a loss or I may not have a loss depending upon what happens with the collateral. That doesn't mean I own it at the point before I foreclose on the property and it becomes my property again. There's a whole process there where I let it go out the door and it's gone. And what I own are promissory notes. I don't own that property until many other things happen. And in this case, you're not—with the exception of a million dollars, you're not dealing with lost principal. You're dealing with lost profits. That's the main part of their claim. So that if it goes back, that would be it. But it shouldn't go back because, again, you don't own it under any of those theories until there's an actual event that triggers the loss. So I'm going to move on to a couple other issues since I have a limited amount of time and I do have a cross appeal.  Yeah, go ahead. So in this instance, again, to Judge Jones' question at the outset, what is the loss here? I don't want to bore you with the facts, but what I do want you to understand is that they don't have a loss. This is a case where they're claiming an interest— first of all, they're seeking lost profits when they've already recovered millions and millions of dollars. From a money-in, money-out perspective, Cooper got back $42 million more than it put in because it was what they call a net winner in the Ponzi scheme. That's fact. Then the second fact is, even if you make these distinctions they like to make between the legitimate funds and the illegitimate funds, let's just talk about the so-called illegitimate funds. On the illegitimate side of the ledger, they made $21 million and got everything back from the receiver— and they're probably going to get it all back from the receiver, by the way, before that's over with, except for $1 million. So they got a $20 million net gain. They don't have a loss in this case. It doesn't exist. This is a case where they are just— and I don't want to— they're just being greedy. That's the bottom line. They're just being greedy. Second, the district court ruled that you can impute— so Cooper— excuse me— so Greenwood and Walsh, who ran two companies called WGTI and WGTC, they were in a joint venture with a man named Carter that ran WCM. Carter did not do— he did not commit any dishonest act. He wasn't indicted. There was never a finding of fraud by him, etc. He's the employee. He and his company is deemed to be the employee under my policy. Not Greenwood. Not Walsh. The district court imputed Greenwood and Walsh's dishonesty to Carter. Because he said they had a joint venture. Because they had a joint venture. Because he was legally liable. But the policy says— it doesn't say we're— it says dishonest acts committed by an employee. Well, suppose the plans had filed suit against Carter as well as the other fellows under ERISA. What's the likelihood, in your view, that they would not have been considered a joint venture in all fiduciaries under ERISA? I think the likelihood under— Or should that go to a jury? I think the likelihood is that Carter was a fiduciary under ERISA because he had a contract— I don't disagree with you on that. But the district court found— they wouldn't have been dealing with WCM but for the nature of these deals that were presented by the other two fellows. All true. All true. But— And so I'm saying if they were— the ERISA definition of fiduciary is notoriously open-ended. And therefore, they would have been fiduciaries under ERISA. And I do not understand why that— at least that part of the district court reasoning isn't accurate. Well, because a breach of fiduciary duty is not dishonest conduct per se. And because you— Carter has to— I agree with you that this was a joint venture. But it seems to me that would have to go to a trial. I don't see how you could— I mean, the fact that the receiver— that two of them went to prison and had the horse farm and all that business and Carter didn't doesn't, you know, doesn't seem to me to satisfy a summary judgment standard necessarily. Well, he granted summary judgment for Cooper on that issue. So I think what you're suggesting is at a minimum, if it went back, there'd have to be a trial. Well, because you're arguing that it should be the other way by summary judgment. I am. I am saying that it wasn't committed by Carter. And there's no evidence. Everybody agrees. Yes, he presented the marketing materials jointly. He didn't know that some of the marketing materials were fraudulent. He didn't know— Greenwood and Walsh were on the East Coast. Carter was in Santa Barbara, California. These guys were marketing people based upon different levels of understanding about what was going on. But the whole point is they had been in business together in some form or fashion for about 30 years, right? That is not accurate, Your Honor. They had been in business since the late 90s, mid-90s, and Cooper came into this in 2004. And so they were in business for about—and then the thing blew up in 2009. So I would suggest to you they were in business for about a decade. But they knew each other. Carter knew Mr. Walsh. Were the WGTI, WGTC transactions marketed through anyone other than WCM? They were all marketed by WCM, WGTI, and WGTC, the three guys, Greenwood, Walsh, Carter. Absolutely, yes. But again, my policy says committed by, not legally liable. So again, yes, as a joint venture, you could argue he's legally liable, maybe not as a matter of law, but you can argue that he was legally liable. They knew or should have known, or they had a fiduciary duty. You can make all those arguments. But he didn't commit the fraud. Well, why don't you move on to another issue? All right, thank you. I mean, the one that—to make a long story short, unless I'm sure my colleagues may have their own view, the one that troubles me the most is the indirect loss, where I think you have the most opportunity potentially to prevail, is the indirect loss exclusion. Okay. Well, the indirect loss exclusion in this case clearly says—let me find my notes here— excludes loss that is the indirect result of, quote, your inability to realize income that you would have realized had there been no loss, close quote. Thus, Cooper's claim for lost profits has to be rejected. That's a clear exclusion that seems to me to apply easily, and to your point, is a very strong argument. I don't know what the rebuttal is to that. So lost profits is excluded by the indirect loss exclusion. Absolutely. Lost profits is excluded. You know, when this case—I mean, this case morphed over time. I don't know if it's clear in the record or not, but it morphed over time because it wasn't clear what the receiver was going to be able to return to all of the investors. And at the outset, the receiver was much less bullish on what has been returned. So there was a big claim for lost principle at one point. At the beginning of this case, that's what we thought this case was about. Okay. But as this case evolved, it became clear it wasn't really about lost principle anymore. It was really about lost profits. And this indirect loss exclusion eliminates that claim completely. So your bottom line on your cross-appeal is? My bottom line on the cross-appeal is, I don't think they can recover lost profits under the indirect loss exclusion period. I don't think they have a loss period. I don't think—I take Your Honor's point about questions of fact, but that would be the worst scenario under the imputation issue. And so I think for those reasons, even if you find ownership, they can't recover lost profits. All right. Thank you, sir. All right. Back to you, Mr. Snyder. Why don't we start in inverse order with the indirect loss issue under the exclusion? Yes, Your Honor. So on indirect loss, you can analyze that both with the lost principle and with the lost earnings. If you look at the lost principle, the loss is direct because Greenwood and Walsh would have fraudulently obtained the loan funds directly from Cooper. So the principle is not excluded. The lost principle would not be excluded under the indirect loss. As for the earnings, this Court addressed that question in B.J. Services. And in B.J. Services, the Court said that the theft of property that the insured owns is a direct loss. So if you reach the cross-appeal issue on the earnings portion, you would have had to have concluded that Cooper did own those earnings. So that wouldn't qualify as a indirect loss. It would be a direct loss. It would be a theft of profits that belonged to Cooper. So the indirect loss exclusion doesn't apply to either the principle or the earnings. Just want to briefly touch on the ownership point. So National Union has said that there's a split on when a loss occurs, whether it's when the funds are dispersed or whether there's a default. National Union's brief doesn't cite any cases that actually say that there's a split. And even if there is, under Texas law,  So if there's a split on that question, and there are multiple reasonable readings of what the word loss means, then Cooper wins and Cooper can recover its lost principle. And Cooper is absolutely trying to recover the lost principle. There's more than $1 million on the bond fund that Cooper hasn't recovered. And Cooper is certainly still seeking that. So that is still an issue that this Court could address. $1 million less $250,000. Yes, Your Honor. But Cooper is still... Your brief never refers to the $1 million. Well, it only barely refers to it. You keep briefing the case in terms of $17 million. Well, if you believe that Cooper is an equitable owner, then that would be the figure. But our brief does include a section, an alternative argument, about if the policy requires legal ownership, that Cooper would still be entitled to its lost profits. And its lost profits is still over $1 million at this point. Or its lost principle. What do you say about their moral hazard argument? So again, you can address that under both the principle and the earnings. On the principle, there's no moral hazard involved because Cooper would not be in any way benefiting from a Ponzi scheme just by making a loan. Cooper would have lost the principle at the moment that it made the loan and there were no earnings to talk about. As for the earnings themselves, Cooper is only seeking its portion of the legitimate earnings. It's not like Cooper is taking funds that belonged to somebody else. Cooper just wants the money that WG Trading actually invested on its behalf and the profits that it actually made. So it's simply not true that Cooper is being greedy in this case. That is the illegitimate profits that it made off the illegitimate portion, right? Cooper's not seeking any illegitimate profits. WG Trading made real investments and the receiver determined that it earned approximately $584 million in real earnings. Cooper is only asking for its portion of those legitimate earnings. And even if Cooper gets that, Cooper has still been hurt in this case because WG Trading would have had a lot more money to invest if Greenwood and Walsh hadn't been stealing funds. If Greenwood and Walsh had invested that money, they would have made even more than they did and Cooper would have received even more in earnings than it did. Cooper's not being greedy. It's trying to get back money on behalf of its employee benefit plans that were legitimately earned and that belonged to the plans. The last point I want to make about equitable ownership, we were talking earlier about the situation in which a trustee steals trust property. That is actually this policy. This policy covers trustees. It defines the term employee to include trustees and would cover the trustee's theft of trust property. Again... Again, it excluded actions for which you are legally liable. It doesn't insure against the crime of the insured. And I'm not sure I'm following why Your Honor thinks that Cooper... Because it is insuring. It's a fidelity bond. It's insuring what people do to you illegally vis-a-vis the third parties, vis-a-vis your property. It's not insuring what somebody in your name does for which you are criminally liable or civilly or criminally liable. Respectfully, Your Honor, I disagree. The policy covers actions by the employee of the insured and so it does cover actions that were taken by the employee of Cooper. So we would ask that you reverse the district court's judgment in favor of National Union and affirm on other grounds and remand for trial. All right. Thank you, counsel. Both sides. Interesting.